## GUITEAU *v.* THE UNITED STATES.

*(Supreme Court of the District of Columbia—April Term, 1882.)*

1. MURDER—JURISDICTION. A wound feloniously inflicted in the District of Columbia, of which the victim died without the District: *Held*, that the giving the wound constituted the felony, and the Courts of the District have jurisdiction of an indictment for murder.

2. INSANITY AS A DEFENSE. When the defense of insanity is interposed in behalf of one charged with crime, it is not error to permit the prosecution to ask witnesses, whether expert or lay, whether, in their opinion, the defendant knew the difference between right and wrong.

3. SAME. The exhibition of sanity or insanity is not a communication in .the sense of the rule which protects the privacy and confidence of the marriage relation; hence it is not error to allow a former wife of accused to testify whether, in her association with him, she ever saw any evidences of his insanity.

Mr. Justice JAMES delivered the opinion of the Court:

The defendant, Charles J. Guiteau, was indicted, tried, convicted and sentenced at a criminal term of the Supreme Court of the District of Columbia, for the murder of James A. Garfield, and has now brought his case into the general term for review upon certain questions of law.

It appears by the record that the defendant shot the deceased on the 2d day of July, A. D. 1881, with a pistol, in the station of the Baltimore & Potomac Railroad, in the city and county of Washington, in the District of Columbia, and that the deceased afterwards, on the 19th day of September, A. D. 1881, died at Elberon, in the county of Monmouth, in the State of New Jersey, of the mortal wound caused by that shooting; that the dead body of the deceased was afterwards brought from New Jersey into this city and county, and that no inquest thereon was held by its coroner or other officer in the District of Columbia. These facts are undisputed.

This indictment is founded on section 5339 of the Revised Statutes of the United States, which provides that—

" Every person who commits murder within any fort, arsenal, dock-yard, magazine, or in any other place, or district of country under the exclusive jurisdiction of the United States ＊ ＊ ＊ shall suffer death."

63

As the argument on the part of the defendant questioned the application of this general statute to the District of Columbia, and as this question has not hitherto been formally presented on appeal, we propose now to re-examine it, notwithstanding indictments under this statute have always been sustained in the Criminal Court and sentence been affirmed here.

That part of section 5339 which has been cited was drawn, in the revision of the statutes, from the act of April 30, 1790, known as the first crimes act, which was passed in the second session of the first Congress, when the Legislature was occupied in measures for putting the new government in operation. The third section of that act provided:

"That if any person or persons shall, within any fort, arsenal, dock-yard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of willful murder, such person or persons, on being convicted, shall suffer death."

The Constitution of the United States had provided that—

"The Congress shall have power   *   *   *   to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may by cession of particular States, and the acceptance of Congress, become the seat of the Government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." Art. I, Sec. 8.

It will be observed that, in designating the places in which the commission of murder should be deemed a crime against the United States, the Legislature employed substantially, and to some extent precisely, the language found in that clause of the Constitution which conferred upon it the power to exercise exclusive legislation over certain places. It was the duty of the Legislature to provide at some time for the cases thus committed to its power by the Constitution, and it is to be gathered from this similarity of the language of the statutes and of the clause of the Constitution referred to, that the Legislature intended to perform that duty at once, in organizing the machinery of the new government. Considered from this point of view, the terms

of the law indicate an intention to provide, so far as the crime of murder was concerned, not only for the forts, arsenals, magazines, and dock-yards mentioned in the Constitution, but for the particular district described in the same clause of that instrument. The designation of place was as strictly applicable to the district, as to the forts and magazines there mentioned. And if it be objected that the new government possessed at that time no district of country which had become its seat, the answer is, that neither had it at that time the dock-yards and magazines for which the statute provided protection against this crime. Every part of that section related to places yet to be acquired. Therefore, if its terms aptly described the "district of country" which has since been acquired as the seat of the Government of the United States, they must be held to apply to that district quite as certainly, and by the same rule of construction, by which they are applied to forts and dock-yards which were not then in existence, but have been acquired since the passage of that act. We are not even embarrassed, under this theory of construction, by a suggestion that Congress must be supposed, in that case, to be legislating about a matter which then floated in uncertainty; for this very district of country, subject to ascertainment by certain measures to be taken on the part of the United States, was accepted, for the purpose of a seat of government, by the act of July 16, 1790, passed at the same session with the crimes act, and only eleven weeks later, so that its acquisition must already have been regarded as substantially an accomplished fact. We know, too, that from the beginning it had been, for important reasons, the anxious purpose of Congress to remove the Government from Philadelphia, and to secure the new residence contemplated by the Constitution. In view of that purpose, it was natural that Congress should at once include this future district, when it came to provide for places under the sole and exclusive jurisdiction of the United States. But, apart from these considerations, we know of no principle which should take out of a statute which, by explicit and unlimited terms, included any and every "district of country under the sole and exclusive jurisdiction of the United States," a district which falls precisely within that description, though, like all the forts, and magazines, and dock-yards of the United States, it was acquired since the passage of that act.

If the third section of the act of 1790 would apply at once to the District of Columbia when it came under the exclusive jurisdiction of the United States, it was not put aside and superseded by the general provision of the act of February 27, 1801:

"That the laws of the State of Maryland, as they now exist, shall be and continue in force in that part of the said district which was ceded by that State to the United States, and by them accepted."    2 Stat., 103.

As these two provisions were not repugnant, but could operate together, this general provision of the later statute, for the adoption of a body of law, both statute and common, and relating to a vast diversity of subjects, did not disturb the more particular provision of the earlier statute relating to a particular subject in that district.

We believe, therefore, that the third section of the act of 1790 has been in force in this district ever since it came under the exclusive jurisdiction of the United States.    But if we had any doubt upon that question, we should hold, without doubt, that it has been in force here since the 21st day of February, 1871, by virtue of the act of that date establishing a new form of government for this District.    The thirty-fourth section of that act, which is now embodied in section 93 of the Revised Statutes, for the District of Columbia, provides that:

"All the laws of the United States which are not locally inapplicable shall have the same force and effect within the District as elsewhere in the United States."

Under the operation of this provision other laws of the United States relating to crimes have been enforced here; and if any law can come within the description of "not locally inapplicable," surely the law of 1790, which, by its strict and peculiar terms, is not only locally applicable, but, as we think, was originally intended to be locally applied, must do so.    If it was put aside in 1801, by the adoption of the laws of Maryland, its operation was restored in 1871.    The usual rule of construction as to repeals is, that a special provision, relating to a particular case or locality, is not superseded by a general provision for all places and cases; but no such problem is presented here.    Both the act of 1801 and the act of 1871 made a comprehensive provision for a whole body of laws, which should be in force here, and, to the extent

of its purview, the latter provision necessarily supersedes the earlier.

We are of the opinion, then, that section 5339 of the Revised Statutes of the United States applies to murder committed within the District of Columbia. It will be found that upon this conclusion rest some very important considerations in determining when the crime of murder can be held to have been committed "within" this District.

The next question is, whether the case presented by the record can be held to fall within this act. The contention on the part of the defendant is, that murder cannot be held to have been committed within the District of Columbia, since the consequent death happened in the State of New Jersey, and that, therefore, the Court had no jurisdiction to try, convict, and sentence him for murder. The theory of this contention is, that murder cannot be held to have been committed in a designated place unless both the blow and the consequent death happen there. In support of this contention it has been argued that, as murder is a term of the common law, and describes a crime known to the common law, we must have recourse to that law in ascertaining not only when but *where* it can be said to have been committed.

It is a settled rule of construction that when a statute borrows a technical phrase from the common law, the Courts must resort to the same source for its definition. Whether the Courts of the United States must do so for any purpose beyond this, in construing and applying a statute of the United States, on the ground that it deals with the same subject which had been dealt with by the common law, is a question which we shall consider in the proper place. Before doing so we shall consider what the conclusions of the common law actually were, and what limitations they would impose if applied to this statute. And, first, was it a conclusion—a rule of the common law—that murder was not committed in a particular place, for example, in a particular county, if the death ensued in another county? It is first stated as a fact, that, in such a case, the offender could not be indicted of murder in either county, and then it is claimed that the reason of this fact was that no complete felony had been committed in either. For a solution of this question we must turn to the higher authorities on the common law and to the facts of history.

The preamble of the statute of 2 and 3 Edw. VI has always been treated as one of the landmarks in determining this question, and it is necessary that we also should turn to it. So much of it as relates to this subject is in the following words:

"Forasmuch as the most necessary office and duty of the law is to preserve and save the life of man, and condignly to punish such persons that unlawfully and wilfully *murder*, flay, and destroy man. . . . II. And where it often happeneth and cometh in ure in sundry counties of this realm that a man is feloniously stricken in one county, and after dieth in another county, in which case it hath not been founden by the laws or customs of this realm that any sufficient indictment thereof can be taken in any of the said two counties, for that *by the custom of this realm the jurors of the county where such party died of such stroke can take no knowledge of the said stroke being in a foreign county*, although the same two counties and places adjoin very nearly together; *ne the jurors of the county where the stroke was given cannot take knowledge of the death in another county*, although such death most apparently came of the same stroke; so that the King's majesty within his own realm cannot, by any laws yet made or known, punish such *murderers* or manquellers for offenses in this form committed and done, . . . for redress and punishment of which offenses, and safeguard of life, be it enacted," etc.

These words suggest important observations. The first clause of the preamble indicates that it was the intention of the Legislature to deal with cases of "murder," and the second describes the persons who are said to have escaped as "murderers." It was not a new offense, but the old offense of "murder," which was to be provided for, and this was to be done by providing a sufficient indictment. The other observation is, that the sole reason assigned for the escape of certain offenders was, that the jurors of one county could *take no knowledge* of a stroke or a death in another county. It is not intimated that the felony was divided, and therefore incomplete in either county; while it is affirmatively stated that the obstacle in the way of punishing the crime lay in the fact that the juries lacked power to take knowledge beyond their counties.

The assertions of this legislative preamble of course have less authority than judicial decisions concerning the actual state of

the common law, and are shown by earlier decisions to be too broad. It was not true that murder could not be sufficiently indicted and punished in any case where the fatal blow was struck in one county and death ensued in another. A statement made by the Court in John Lang's case, which was decided in 6 Hen. VII, p. 10, fifty-nine years before the statute of 2 and 3 Edw. VI, is conclusive authority that the crime might be tried in the county where the blow was struck, if the body was brought thither from the county where the death happened, so that the jury might have the *evidence* of the death within their lawful cognizance. After stating a case where the blow and the death happened in different counties, the Court said: "In this case *it has been used*, after the death, to bring the dead man, to wit, the body, into the county where he was struck, and then to inquire and to find that he was struck and died of that." Such a practice shows, first, that the obstacle in the way of an indictment was the limitation of the jury's power "*to take knowledge;*" and, secondly, that the murder was deemed to have been *committed* in the county where the blow was struck, notwithstanding the consequent death happened in another county.

Only a year later (7 Hen. VII, p. 8), in a case where no such device as the removal of the body appears to have been resorted to, the Court went a step farther, and it was held that an indictment which laid the blow in Middlesex and the death in Essex was good, because the striking was the principal act, and they who could take notice of the principal of, could take notice of the death, as accessary, though in another county. There was a dissenting opinion, but the case is authority to the point that at common law the murder was committed where the felonious blow was struck. Tremaille, J., said:

"It seems that it is not material where he died, for the striking is the principal point, but it requires death; otherwise it is not felony; but whether he died in one place or another is not material."

The early authorities leave no room to doubt that the common law, before its course was interrupted and confused by the statute of Edward VI, held that when the fatal blow was struck in one county and death ensued in another, the murder was committed where the blow was struck. Whatever difficulty there

may have been in the way of an indictment or trial, lay in the question whether the jury could know anything of the death in another county.

We are not likely to appreciate the importance which then attached to this question, unless we remember that originally both the grand and petit jury found the fact wholly of their own knowledge, and that although, for some time before the statute of Edward, they might hear witnesses, yet at that very time they were at liberty to disregard the witnesses and still to find according to their personal knowledge. Both Mr. Forsyth, in his "History of the Trial by Jury" (p. 164), and Mr. Starkie, in his essay "On the Trial by Jury" (2 Law Rev., 396), cite from the case of *Reniger* v. *Fagossa*, Plowd. Comm., 12, which was decided in the second year of Edward VI, the very year of the statute, a statement made by Sir Robert Brooke, then recorder of London, concerning the functions of the jury, which throws light upon the preamble referred to, and shows what was meant by a capacity *to take knowledge.* The recorder said:

"As to what has been said by the King's attorney, that there ought to be two witnesses to prove the fact, it is true that there ought to be two witnesses at least where the matter is to be tried by witnesses only, as in the civil law; but here the issue was to be tried by twelve men, in which case *witnesses are not necessary;* for in many cases an inquest shall give a precise verdict, although there are not witnesses, or no evidence given to them. As, if it be found before the coroner, *super visum corporis*, that I. S. killed the dead person, and he is arraigned and acquitted, the inquest shall say *who* killed him, although they have not any witnesses; so that witnesses are not necessary but where the matter is to be tried by witnesses only. For if witnesses were so necessary, then it would follow that the jurors could not give a verdict contrary to the witnesses, whereas the law is quite otherwise; for when the witnesses for trial of a fact are joined to the inquest, if they cannot agree with the jurors, *the verdict of the twelve shall be taken, and the witnesses shall be rejected."*

This power of the jury to find upon their own knowledge was recognized by the Courts long after the time of Edward VI, and even as late as 1670, when it was said in Bushel's case, by the Court of Common Pleas (Vaughan Rep., 135), that the jury

being returned from the vicinage whence the cause of action arises, the law supposes them to have sufficient knowledge to try the matters in issue, "and so they must though no evidence were given on either side in Court."   It was only when the practice of new trials was introduced that juries were no longer allowed to give verdicts upon their own knowledge.   (Forsyth, 165; Starkie, 2 Law Rev., 398.)   When this power was finally annulled by the remedy of new trials, the trial by jury had been practiced for five centuries at least (Starkie, 398); and Mr. Forsyth remarks that—

"*The fiction* was still kept up by requiring them to be summoned from the hundred where the crime was alleged to have been committed, until the passing of Stat. 6 Geo. IV, c. 50, by which the sheriff is now obliged only to return for the trial of any issue, whether civil or criminal, twelve good and lawful men of the body of his county."   Forsyth, 208.

This power to act on personal knowledge fixed the limitation of the inquiry, and the jury was understood to have cognizance of those matters only which they might thus know.   This it was that determined whether it was practicable to try certain felonies in a particular county.   It was inevitable, however, that commentators and Courts should endeavor to explain and assign reasons for the law, and in later times it came to be the opinion of some of them that the reason why no sufficient indictment of murder could be found, as they supposed, when the fatal blow was struck in one county and death ensued in another, was, that, in contemplation of law, *the felony was not complete* in either. The reasons given for a fact of common law are not themselves necessarily law; and it seems clear that, in this matter, what was only a fact touching the cognizance of juries, has been confounded with, or supposed to establish, a definition of the crime of murder.   Upon this hypothesis they have proceeded to show how the murder may be regarded as committed partly in one county and partly in another.

The earlier common law authorities seem to have had no doubt as to where the felony was committed in such a case; and they seem to have had no doubt even as to the cognizance of the jury, if the facts could be brought to them.   But doubts on this

64

point certainly did grow up, and the actual condition of opinion, when the statute of Edward VI was passed, is fairly stated by Hale: .

"At common law [says that great authority] if a man had been stricken in one county and died in another, it was doubtful whether he were indictable or triable in either; *but the more common opinion was* that he might be indicted where the stroke was given, for the death is but a consequent, and might be found though in another county (9 E. IV, 48; 7 Hen. VII, 8); and if the party died in another county, the body was removed into the county where the stroke was given, for the coroner to take an inquest *super visum corporis* (6 Hen. VIII, 10); but now, by the statute of 2 and 3 Ed. VI, c. 24, the justices or coroner of the county where the party died shall inquire and proceed as if the stroke had been in the same county where the party died." 1 Hale P. C., 426.

The learned Chief Justice Abbott, speaking in the case of *Rex* v. *Burdett* (4 B. Ald., 169), has assigned to Hale his proper place by treating him as much higher authority than the preamble of the statute of Edward VI, touching the previous condition of the common law:

"It seems somewhat extraordinary [said he] that the preamble of the statute should be expressed in the terms in which we find it, *because Lord Hale mentions* the point as being doubtful at common law, and says the more common opinion was that the party might be indicted where the stroke was given."

We think it is quite safe to have the same confidence in Lord Hale's reading of the history of this question, which was thus expressed as a matter of course by Chief Justice Abbott.

We believe that these authorities establish the conclusion that at common law, when a felonious blow was struck in one county and death ensued in another, *murder was held to have been thereby committed in the county where the blow was struck.* They excluded the notion that the death was one of the acts of felony, and that when it happened in a different county from that of the blow, the felony was incomplete in each. In this respect the common law has undergone no change, and what it has always been is well stated in a late English decision. In *The King* v. *Hargrave*, 5 Carrington and Paine, 510, the prisoner was indicted

as a principal in a second degree in the manslaughter of Richard Dodd. The indictment stated that James Cox assaulted and beat the deceased, giving him divers mortal bruises, in the parish, etc., in the county of *Middlesex*, etc, "of which said bruises and contusions" the said Richard Dodd there, etc., until, etc., at the parish, etc., in the county of *Kent* did languish, etc., and that he there died, and that the said James Hargrave, together with, etc., were then and there present aiding and abetting, etc., the said James Cox in the commission of the said felony. It was objected that the indictment was bad, as it did not charge the commission of the offense in any particular place, for that the word "there" referred to the two parishes mentioned in different counties.

Mr. Justice Patterson said:

"*The giving of the blows which caused the death constitutes the felony.* The languishing alone, which is not part of the offense, is laid in Kent. The indictment states that the prisoners were then and there present aiding and abetting *in the commission of the said felony;* that must, of course, apply *to the parish where the blows, which constitute the felony, were given.*"

Of course the limitations of cognizance which grew out of the original function of the English jury to find the fact as of their own knowledge, and survived so long in that country, have no application to the juries provided by the laws of the United States, whether for service in the States or in this District. No such traditions or anachronisms were adopted by this government when it adopted the trial by jury. When the Constitution ordained that "the trial of all crimes, except in cases of impeachment, shall be by jury," it simply provided that a body of twelve men should be the tribunal by which the fact of the crime should be tried. So much of the common law was adopted, and there the intervention of the common law ceased. The *vicinage* and its survivals have never been known to the system thus established. The jury of the Constitution was to try felonies committed on the high seas, a class of cases which the common law jury was not competent to try; and it might be drawn from all corners of a judicial district, or from a single village remote from the place of the crime, or from any place or in any manner which the Legislature should prescribe, provided it was a jury of

the district in which the crime was committed. Its function was to hear witnesses, and to find the fact upon their testimony, and it was to be competent to hear whatsoever it should be lawful to prove. It was joined to the Court, and was to occupy all the ground which was occupied by the jurisdiction of the Court.

We have given attentive consideration to the conclusions of the common law, because it has been urged that the phrase "commit murder within," etc., as employed in the statute of 1790, is technical, and that its meaning must be ascertained by reference to that law; and because this statute has been technically treated in an early case, by means of common law definitions. We believe that the meaning of this provision against the commission of the crime of murder within the designated places, is to be settled on grounds which are independent of the common law. But if there be reason for any doubt whether Congress intended to use this phrase in the sense of the common law, then we hold that, according the principle of that law, murder is committed within the District of Columbia when the felonious blow is struck here, notwithstanding the consequent death happen without the District and in one of the States.

We turn now to the peculiar and higher ground on which we conceive this question should stand, and to considerations to which, as a Court of the United States, exercising the judicial power of the United States, we are required to give especial attention. However proper it may be that the Courts of the States where the common law exists should treat the question of jurisdiction from the standpoint of that law, that question must be treated by the Courts of the United States, wherever a fort or a magazine or an arsenal or a district of country is under the exclusive jurisdiction of the National Government, from the standpoint of Federal authority and with reference to the relation of the crime to the sovereignty of the United States.

We take it to be a fundamental rule of construction, that an independent and sovereign government is always to be understood, when it makes laws for its own people, to speak without any reference to the law of another people or government; unless those laws themselves contain plain proof of a contrary intention; and that, when it thus appears that something is actually borrowed and embodied therein from the laws of another

people, the extent of that adoption is to be strictly construed, and not enlarged by implication. So far as its laws can be understood only by reference to foreign law, that reference is authorized by the law-maker, because it is necessary; but so far as its commands may be understood as original terms, and without such reference, they must be construed independently. It is only when understood to be to this extent, the original expression of its own will, that its words can communicate to its own people the whole and self-sufficient force of that will. To assume, without plain necessity, that it utters the intention of an alien law, is to ignore to just that extent its absolute independence of existence and action and will. The law before us is one to which this fundamental rule is plainly to be applied. The word "murder" was used in it as the designation of a known crime, and the statute furnished no definition beside the simple use of this term. It was used, of course, as it has always been used by all English-speaking people, and it could only mean, as it had meant in the colonies and in England, that crime which is committed—

"When a person of sound memory and discretion unlawfully killeth a reasonable creature under the peace of the sovereign, with malice aforethought, either expressed or implied."

It is necessarily understood that, to this extent at least, the Legislature had in mind the law of another government, and authorized us to turn to that law for explanation. But does this law contain any other terms which may not be understood without consulting a foreign law, and searching the decisions of foreign tribunals for the operation of that law? We say foreign law, for this government had no common law of its own, to which the Legislature could be supposed to refer, nor any law but the Constitution which established it. Therefore we repeat, does this statute contain any other terms than the word "murder," or any other provision which cannot be perfectly and certainly understood, without assuming that a foreign law, with the peculiar methods of its operation and its application to territorial divisions, was adopted into it by implication? If there never had been such a thing as a common law decision or rule to determine the situs of the crime, the language of this statute would have been deemed certain and intelligible; has it become in itself uncertain and unintelligible because the common law had a rule

on the same subject?   If we are to go beyond it for explanation, the object to be accomplished by the Federal Government, and the subjects dealt with, must furnish that explanation, and determine how the law was intended to operate before we turn to a foreign explanation.   Certain places, the forts, arsenals, dockyards, and magazines of the general government, and a certain district of country to be set apart for its residence, were withdrawn from the control and protection of the States and placed by the Constitution under the exclusive protection of the United States.   The Legislature of the United States was charged with the duty of protecting these places against the commission of crimes therein, and therefore it must be understood to have intended, when it provided for the punishment of a particular crime, to accomplish completely this office of protection.   It is said that penal statutes must be strictly construed, but it has long been settled that they are, nevertheless, to be construed, like all other statutes, according to their plain and sensible meaning, and that a plain and sensible purpose is not to be defeated by an arbitrary method of reading its words.   These words, then, must be so construed as to effectuate the intention of complete protection against the crime of murder in the places designated, if their ordinary and reasonable meaning permits such a construction.   The plain object of this legislation was protection against *acts*, and the subjects dealt with in the law were *acts* done in those places.   The act designated in this section was murder, the doing of that which constituted the unlawful killing of a reasonable creature under the peace and protection of the United States, with malice aforethought; and the Legislature must be understood to provide for *all* acts of that nature committed within the place designated.   When a particular act belongs to the class and is of the nature of the act here described as murder, the question whether it was committed in the designated place, is a question whether it was so committed *in contemplation of this statute*—not whether it was committed there in contemplation of the common law of England or of the several States. Looking only to the statute itself, then, and excluding the alleged notions of the common law—notions which we have found not to have been a part of the law—we find that it regards murder as an *act* committed by the offender, an *act* committed in the

place designated.    Read in this light, the plain and sensible
meaning of the words includes all acts committed there which
are found, within the year and the day limited by the law of
murder, to have combined all the facts which constitute murder.
We find nothing in the statute, as we have found nothing in the
common law, which indicates that an act is not murder in a par-
ticular place because the consequences of that act happened in
some other place.    If the act of the offender achieves murder,
then *that act* is murder; and if that act is done in the place des-
ignated, then, in contemplation of this statute, the offender com-
mits there the crime of murder.

We are aware that a very learned Judge of the United States,
whose ruling was afterwards followed by an equally learned Judge
of the same Court, substantially held in an early case, that the word
"murder" alone, in another section of this statute, limited its ap-
plication to those cases of murder in which the death happened in
the same place with the felonious blow.    It was pointed out that
murder involved *killing*, and then, in effect, although it was not
so stated explicitly, the statute was construed as if it had read,
"if any person shall unlawfully and with malice aforethought
*kill* another" within a certain place.    Accordingly it was held
that, unless the injured person died there, he could not be said
to have been killed there, and that, therefore, the accused had
not committed there the crime of murder.    We are sensible of
the embarrassment of differing on any question of law from au-
thorities so eminent, but we observe that in both cases the dis-
cussion of this question was brief, and consisted of little more
than a statement of the proposition.    Such a method of apply-
ing the severed parts of a mere formula seems to us to be inad-
missible.    The definition of murder which has come to us from
the common law is, of course, sufficient, and it does state that
murder involves killing; but it does not follow that, by recasting
this formula, the statute is to be read as if it had said "every
person who, with malice aforethought, unlawfully *kills* another
upon the high seas, or within any fort," etc.    If we should apply
such a method of construction to the clause before us, we should
give not only a new form to the statute, but a new effect to the
definition; an effect not given by the authorities who formulated
and used it.    While accepting its sufficiency, they held in effect

that murder described the doing of the unlawful act, the offense, with malice aforethought, by which, within a year and a day, the stricken party was killed.   Tremaille, J., has said, in the case in the year books already referred to, nearly four centuries ago, "the striking is the principal point, but it requires death; otherwise it is not felony; but whether he died in one place or another is not material" (7 H. VII, 8); and that doctrine was so firmly fixed that Mr. Justice Patterson repeated, in the very late case of *Rex* v. *Hargrave*, "the giving of the blow which caused the death constitutes the felony." Although the definition stated that murder involved killing, it was consistent with the theory that the crime of murder was committed in the place where the offender acted, if his offense accomplished the killing.   By recasting the definition of murder, and applying it in a new form, the statute is made to punish in respect of the consequences rather than in respect of the offense which caused and *ultimately included* the consequences.

The intention of this statute, as to the question whether a murder was to be regarded as committed in the places named, is further shown by the nature of those places.   The law contemplates that the injured party may languish, and that if he dies within a certain time, the death may be traced to the blow.   But it was known that a dock-yard or a magazine would afford no accommodation for persons stricken by mortal blows.   Could it have been intended that the offense should not be included in the statute, unless he languished and died there ?   It was probable that, in almost every instance where a mortal blow was struck in such a place, the victim would be carried from it into a place not within the exclusive jurisdiction of the United States.   Could it have been intended that the statute should fall to the ground the moment he left the door of the magazine, and that if he died just outside of its limits no murder was committed there, although all the elements of murder were combined in the case? If the very terms of this statute seemed to exclude such a case, it would be inadmissible to argue *ab inconvenienti* that they did include it; but such considerations are proper in determining whether, by reasonable construction, they do include it.   In referring to them we only keep in mind that it was the duty and the probable intention of the Legislature to furnish to the places

committed to its exclusive care complete and effectual protection against criminal acts.    As a matter of *power*, it was competent for the Legislature to provide for such offenses wherever the death might happen.    The question is, whether it actually did so provide by this statute, or omitted what, so far as arsenals, dock-yards, and magazines were concerned, were likely to be the most numerous class of cases happening there.    We hold that these cases were not omitted, and that where a murder is committed at all, this statute applies to it, if the fatal blow was struck in one of the designated places, notwithstanding the consequent death happened in another place.

There is yet one other consideration which we conceive to be important, namely, that the construction which we have given to this statute is consistent with the intent of the sixth amendment to the Constitution.    That articles provides that, "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district *wherein the crime shall have been committed.*"    The Constitution had already declared that:   "The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crimes shall have been committed;" but the protection of accused persons against the hardship of removal to a distant place of trial, and of increased difficulties of defense, was a matter of so much concern that a further limitation was added.    The important point is that, under both provisions, the place of trial and the tribunal were to be determined by the place where the crime was committed, and that this protection of accused persons was not to be defeated by any *unnecessary* theory as to where a crime must be deemed to be committed.

This provision of the fundamental law had no reference whatever to the common law, or to the peculiarities of any external system.    It was intended to be an expression in original terms, a provision which was sufficient in itself, and which spoke for itself; and it plainly assumed that the place wherein a crime was committed was the place where the *act* of the offender was done.

It was, on the one hand, the general intent of the Constitution that the Federal power to punish acts which were crimes against the United States should be plenary, and, on the other, it was the

65

intent of this protection of the accused party, that crimes should be deemed to be committed where the manifest act was done, and not where the mere consequences of that act finally happened. The application of this principle of construction does not depend on the question whether the place in which the act is done is in a State and judicial district of the United States. The provision referred to contains, independently of that question, a rule for determining *where* a crime shall be said to have been committed. It imports that the crime shall be held to be committed in the place where the offender manifestly acts, and it forbids any law which should provide for his trial in a district where the ultimate consequences of his act happen, but where he does not act. If we apply this construction of the Constitution to the crime of murder, it is plain that the power of the United States to punish *as* murder a crime which proves ultimately to be murder is plenary, and that it is the intent of the same supreme law that that crime shall be deemed to have been committed in the place where the act was done by which the murder was brought about. This rule for placing the commission of the crime is not dependent upon the question whether this is a judicial district of the United States. It applies to the construction of the statute of 1790, and governs us in determining when crimes are committed here.

We hold, therefore, that the criminal Court had, upon the case shown by the record, jurisdiction to try, convict and sentence the defendant for murder committed within the District of Columbia.

We have now to inquire whether error occurred in the trial.

It appears that several experts in insanity, and unprofessional witnesses who had knowledge of the defendant, were asked whether, in their opinion, he knew the difference between right and wrong, and to this question and the affirmative answer exception was taken, on the ground that a witness can only state an opinion as to sanity or insanity, and that knowledge of right and wrong is a conclusion which must be left to the jury. Insanity is a defense on the very ground that it disables the accused from knowing that his act is wrong. The very essence of the inquiry is, whether his insanity is such as to deprive him of that knowledge. If a witness is competent to give his opinion as to the mental condition of the accused, he is competent to state his

opinion as to the degree of capacity, or of incapacity, by reason of disorder, and whether the disorder seemed to have reached such a degree as to deprive him of the knowledge of right and wrong. That capacity or incapacity is itself a·question as to the extent of the disorder, if the disorder exists, and is not a conclusion to be drawn from the existence of insanity. These witnesses were competent to speak to the question of sanity or insanity, and therefore as to this question as to one of its degrees. We find no error in the ruling which admitted this question and the answer.

Dr. Fordyce Barker, an expert on the subject of insanity, was asked:

"Is the habit of boasting of intimacy with people holding high position and possessing influence and power, when the fact is otherwise, any evidence, in your judgment, as a scientist, of an insane delusion?"

The answer was:

"It is not an evidence of a delusion of an insane person, because it is not the result of disease. It is a result of vanity and self-conceit and love of notoriety. These are vices and not diseases."

To this answer exception was taken, because the witness, in determining the nature of this trait, said it was a vice and not a disease. The question whether a certain trait was an indicium of insanity involved the question of its nature, and we do not perceive that the witness exceeded the limits of the inquiry in stating precisely what that trait was. But there is another consideration. The act of killing the deceased was conceded, and this answer could have no tendency to prove that the accused had committed it. It was not admitted as bearing upon the question of guilt. The only issue was sanity or insanity, and the answer affected that issue alone. It could therefore do no injury to the defendant's rights *as to the act*, and it was not irrelevant to the issue of insanity. The opinion of an expert is not regarded as an invasion of the rights and office of the jury, and if this opinion, as to the actual character of a trait, was substantially a statement of its relation to insanity, it was not an interference with the office. We find no error in this ruling of the Court.

Mrs. Dunmire, who was married to the defendant in July, 1869, and was his wife for four years, but had been divorced from him, was asked the following question:

"I will ask you to state to the jury whether, in your association with him (the defendant), you ever saw anything that would indicate that he was a man of unsound mind?"

The Court had ruled that the confidential communications between husband and wife were protected in the examination. The question was admitted under exception, and the answer was:

"I never did."

This question called for the witness' observation of the defendant's soundness or unsoundness of mind, and the objection goes partly on the ground that, notwithstanding the ruling of the Court that confidential communications between husband and wife were protected, she may have included, as a part of the basis of her answer, what are understood as *communications* from her former husband. We think that the exhibition of sanity or insanity is not a communication at all, in the sense of the rule which protects the privacy and confidence of the marriage relation, any more than the height or color, or blindness, or the loss of an arm of one of the parties is a communication. The rule which is supposed to have been violated was established in order that the conduct, the voluntary conduct, of married life might rest secure upon a basis of peace and trust, and relates to matters which the parties may elect to disclose or not disclose. It was provided in order that matters should not come to the light, which would not do so at all without a disturbance and disregard of the bond of peace and confidence between the married pair. Therefore it has not been applied to any matter which the husband, for example, has elected to make public, by doing or saying it in presence of third persons along with his wife; and it cannot be applied to that which, whether he will or no, he inevitably exhibits to the world as well as to his wife. Some diseases a husband may conceal, and he may choose whether to reveal them or not. If he should reveal the existence of such a disease to his wife, in the privacy of their relation, she may never disclose that communication, even after the relation between them has ceased.

But sanity or insanity are conditions which are not of choice, and when the disease of insanity exists, the exhibition of it is neither a matter of voluntarily confidence nor capable of being one of the secrets of the marriage relation. The fact that there are in-

stances of cunning concealment for a time, does not affect the general truth that insanity reveals itself, whether the sufferer will or no, to friends and acquaintances as well as to the wife. In short, the law cannot regard it or protect it as one of the peculiar confidences of a particular relation. It may be added that it is difficult to perceive, in any view of this subject, how the witness' denial that she had seen indications of insanity, can be said to reveal any fact which her husband had communicated to her. If our opinion that sanity or insanity cannot be a communication within the meaning of the rule, should be wrong, it must be remembered that *sanity* is a presumption of law, and that the wife would seem to reveal nothing to the world, unless she should say that the existence of *insanity* in her husband had been communicated to her by his conduct during their connection. We are of opinion that no error was committed in receiving this evidence.

Several witnesses were allowed to testify to acts of the defendant in 1872, and in two or three years following, which were fraudulent. Evidence had been introduced on his part, for the purpose of proving insanity, which searched the history of his whole life, down to the time of the act charged in the indictment. The defendant himself had, as a witness in his own behalf, gone over the same ground. In this body of defensive evidence his moral nature and traits had been presented, as a means of showing that acts done by him must be accounted for by a conclusion of insanity. It was competent to show, in rebuttal, that the grounds on which this inference of insanity was based, did not exist, and to do this by exhibiting particular acts and conduct of the defendant, contemporaneous with the history produced on his part, which tended to disprove the existence of those grounds. If a conclusion might be drawn from his moral nature that his acts must be insane, it was relevant and proper to show that his *real* moral nature was one which did not call for such an explanation.

After comparing the evidence, as to particular acts, offered on both sides, we are of opinion that the evidence in rebuttal was responsive to the evidence in defense, and was admissible. It must be remembered that the killing of the deceased was admitted; the implication of malice had already been made when the

prosecution rested their case.   The issue now was whether the defendant was responsible for that act by reason of insanity. The application of his improper acts was limited, therefore, to that issue.   For these reasons we find no error in the admission of the facts referred to, and for the same reasons we find none in that part of the charge to the jury which related to this point.

Exception was taken to the refusal of the Court to instruct the jury concerning the effect of an incapacity to act upon and follow a knowledge of the difference between right and wrong. The instruction given was in the following words:

"If he is laboring under disease of his mental faculties—if that is a proper expression—to such an extent that he does not know what he is doing, or does not know that it is wrong, then he is wanting in that sound memory and discretion which makes a part of the definition of murder."

To this statement, counsel asked the Court to add: "Ot does not know that it was wrong, or if he did know it was wrong, had not the power to resist it," which was refused.   It appears that the Court did not afterwards state to the jury what the law was, in reference to want of power to act upon an actual knowledge of the difference between right and wrong.

We are not called upon by this exception to decide what the true rule of law is upon that subject, but whether the Court erred in not laying down any rule.   It is not error to refuse to instruct the jury upon matters of law, where no evidence tending to raise the question had been introduced; and we think the Court was clearly right in holding that while *no* evidence tending to show an incapacity to act upon a knowledge that the act was wrong had been introduced, the affirmative tendency of the evidence was to support a wholly different theory and ground of defense.   We are of opinion that the evidence in the case did not call for any ruling upon the point made, and that no error has intervened in this matter.

Exception was taken to the judgment, on the ground that the sentence fixes a day for execution in violation of section 845 of the Revised Statutes for the District of Columbia.   The objection is, that under this section execution must be postponed till after the next term, namely, the April term of the Court in general term, and that, in contemplation of law, the term extends to

the time fixed for the beginning of the October term; so that the day fixed by the sentence falls within and not after this term.

The section referred to is in the following words:

"To enable any person convicted by the judgment of the Court to apply for a writ of error, in all cases when the judgment shall be death, or confinement in the penitentiary, the Court shall, on application of the party accused, postpone the final execution thereof to a reasonable time beyond the next term of the Court, not exceeding in any case thirty days after the end of such term."

The first day of a term of this Court, but not its duration, is fixed; the term ends whenever the Court adjourns *sine die*, and is then determined for all purposes. As section 845 was framed in contemplation of this theory of the ending of a term, it follows that, if the day to which final execution of a sentence is postponed falls after the next term of this Court, as determined by its adjournment *sine die*, execution is postponed in accordance with the meaning of that section. If it should happen in any case that this Court has prolonged the "next term" referred to until the day set for final execution is reached, the Criminal Court would then be authorized, upon application of the party, to postpone execution, so that it should fall after the actual adjournment *sine die* of this Court. It is not shown that the terms of the sentence have violated section 845, and we find no error in this action of the Court.

Some other exceptions of minor importance were discussed in the argument. We have considered them, and have found no error in the rulings to which they refer. A new trial is therefore denied, and the judgment of the Court is affirmed.

I will here observe, that although I was requested to give the opinion of the Court, there were some considerations which I found it inconvenient to combine with those that I have prepared, and for which I was indebted entirely to the investigations of my brother Mr. Justice Hagner. I asked him to have the kindness to help out this opinion by a separate suggestion of those grounds.

Mr. Justice HAGNER.     It was asserted with much confidence by the counsel of the prisoner, in his earnest argument, that under the law as it existed in Maryland at the time of the cession of the District of Columbia to the United States, that if a mortal blow had been given within the territory now comprehended in the District boundaries, and the victim had died in another jurisdiction, the offender could not have been punished within the State of Maryland.

The decision of this question is not essential to the position upon which the opinion of the Court has been placed—that the crime is punishable under the statutes of the United States, without reference to the antecedent conditions of the State law before the crimes act was enacted—but the point was much pressed, and has been carefully considered by the Court ; and in compliance with the request of my brother James, I will state the result of our examination of the statutes of Maryland bearing on the subject.

Before the Revolution, the Courts of the province having criminal jursidiction were known as the Provincial Courts and the County Courts. The former possessed general jurisdiction over the entire province in all matters, criminal as well as civil; while to the County Courts was entrusted the punishment only of the more trivial offenses.

The first State Constitution of 1776 transferred the authority of the Provincial Court to a tribunal known as the General Court, and retained the County Courts under their old name. By law the sessions of the General Court for all the counties lying on the east side of Chesapeake Bay, known as the *Eastern Shore*, were required to be held in Talbot county, and those for all the counties of the *Western Shore* were to be held at Annapolis. Various statutes were enacted extending the criminal jurisdition of the County Courts, from time to time, until the year 1785, when the Legislature at the November session passed a statute, chapter 87, entitled "an act concerning jurisdiction," by the seventh section of which it was declared—

"SEC. 7. That the justices of the several and respective County Courts shall have full power and authority, unless in cases particularly directed by law to be tried in the General Court, to try, according to law, all and every person and persons,

who have committed or shall commit any offense or crime whatsoever, although it may subject such person or persons to the pains of death, and upon conviction of the offender or offenders in due course of law, *in the County Court of the county in which the crime or offense shall be committed*, give judgment according to the nature and quality of the crime or offense."

By section 8 it was provided: "That every person charged, apprehended, or indicted for any capital crime, or such as will subject such person upon conviction to an infamous punishment, shall have a right, upon application to any judge of the General Court, or any two justices of the County Court, to a *habeas corpus cum causa*, to remove himself or herself, with the proceedings in the case, to the General Court, where such person shall be tried upon such removal."

It is evident that the Legislature, by the 7th section of the statute, entrusted to the County Courts the amplest power to try all criminal cases whatsoever; with the positive condition, however, that the trial should be had in the county *where the crime should be committed.* This expression was afterwards introduced into the Constitution of the United States in two places, and into the crimes act, and in our opinion was designed by the Legislature to have the same signification we have already, in the opinion of the Court, ascribed to that act of Congress. The county in which the crime is *committed*, upon every fair principle of construction and reason, must be held to mean the county within which the act of violence was performed, or, as expressed in 9 Humph., 656, *Riley* v. *State*, "where the active agency of the perpetrator was employed."

The *common-sense* signification of the expression cannot admit of serious question when subjected to practical test.

In 1865 Booth inflicted a mortal wound upon President Lincoln in Ford's theatre. The dying President was removed to a dwelling on the west side of Tenth street. If the boundary line of the District had passed between the two places, as might well have been the case, Mr. Lincoln would have died in another jurisdiction. It cannot be contended that Booth did not *commit* murder. If it be asked *where* it was committed, can it be said, with any appearance of reason, that he committed it in the

66

*dwelling*, where he had never set foot? If it be said that the murder was not committed *until the death ensued*, then, if Booth had been instantly slain by his pursuers, he would have committed the murder many hours after his own death.

Can it be supposed that the Legislature, when deliberately enacting a statute "concerning jurisdiction," intended to perpetuate a supposed technical rule that never would have been thought of except for the peculiar constitution of the juries in remote times, which never had place in this country at all?

The Legislature expressly repudiated the idea that any crime punishable by the County Courts should thereafter be supposed to be capable of performance in *two* counties. Whatever might be its character or atrocity, it *should* thereafter be held to have been perpetrated only in *one* jurisdiction, viz., "the county *in which* the crime shall be *committed*."

The supposed doubt as to the law where a murder has been done under the conditions referred to in the preamble of the statute 2 and 3 Edward VI, must have been familiar to every lawyer of the day. That statute had been in force in Maryland since its settlement one hundred and fifty years before (Kilty's Report of the Statute, p. 165). It would not only have been an inexcusable neglect of duty in the Legislature to have refrained from adopting sufficient words to remove any possible doubt on the point, while they then had the subject of jurisdiction in hand; but it would have been in violation of a cherished principle familiar to the people of the confederation and of the State, to have admitted the possibility that an accused person should thereafter be triable in a different jurisdiction from that where the act of violence occurred. It was one of the complaints in the Declaration of Independence against the English king, that he had given 'his assent to laws which had for their object "*transporting us beyond seas*" for trial. And in article 18 of the declaration of rights prefixed to the Maryland constitution of 1776, it was declared that "the trial of facts *when they rise* is one of the greatest securities of the lives, liberties and estate of the people."

And this same principle was subsequently incorporated into the Constitution of the United States, in article 3, which declared that—

"The trial of all crimes, excepting in cases of treason, shall be by jury, and such trial shall be had in the State *where the said*

*crime shall have been committed,* but when *not committed* within any State, the trial shall be at such place or places as the Courts shall by law have directed."

And it was still further enforced in the 6th amendment to the Constitution, which struck out the exemption of the crime of treason from the right to trial by jury, and limited the selection of the jury to the district, as well as State, *"wherein the crime shall have been committed."*

If the Legislature had undertaken to determine the place of trial, as between the locality where the blow was stricken and that of the death of the victim, every consideration of convenience, justice, public policy, and observance of constitutional injunction, would have conspired to induce them to provide that the trial should occur within that jurisdiction whose laws were charged to have been violated by the accused party, rather than to require his removal from the place "where the facts arise" to a State perhaps far remote from friends, and from the witnesses of the transaction, to a jurisdiction where the laws might, on the one hand, be of far greater severity, or where, on the other, the deed might not be considered criminal at all.

It was not necessary that the Legislature should employ many words to express their purpose to establish this rule of law for the future. An apt phrase or word was sufficient, and they selected and adopted as adequately declaring their meaning the words, *"where the crime shall be committed;"* which were in entire sympathy with the provisions of the fundamental law referred to.

Subsequent statutes of Maryland support this view of the act of 1875.

By chapter I of November sessions, 1787, which recited the insecure condition of the public jails of the State, and the hazard of keeping prisoners until brought to trial at the stated terms of the ordinary Courts, the Governor was authorized, upon application, "to issue commissions of oyer and terminer and jail delivery for the trial of the crimes that have arisen or may arise in any county of this State, whenever it shall appear to him that there is a necessity such commissions should issue."

Neither in this act authorizing the creation of these Courts of oyer and terminer, nor in the eighth section of the act of 1785,

authorizing the General Court to try certain criminal cases brought before it by *habeas corpus*, was there the same plain injunction that the trial should be in the jurisdiction *where the crime was committed*, as had been adopted with respect to the *County Courts*, in section 7 of the act of 1785, chapter 87.

The absence of such a provision as to the General Court and the Courts of oyer and terminer, gave rise to the passage of the act of November session, 1789, chapter 22, entitled "An act to ascertain the mode of trial in certain cases," which is in these words:

"SEC. 2. Whereas, doubts have been entertained if a mortal stroke be given on one shore of this State, and the parties stricken die on the other shore thereof, where and in what manner the party giving such mortal stroke shall be tried:

"*Be it enacted by the General Assembly of Maryland,* That from and after the end of this session of assembly, if a mortal stroke shall be given within the body of any county on one shore of this State, and the party so stricken shall die thereof within a twelve-month and a day from the time of such stroke given within the body of any county on the other shore of this State, the party giving such mortal stroke, and all aiders and abettors, etc., shall and may be indicted, arraigned, and tried in the General Court of either shore, or by Justices of oyer and terminer, sitting either in the county where the stroke shall be given, or in the county where the death shall happen, and judgment shall be given, and execution had, in the same manner as if the stroke and death both happened on the same shore, or in the county where the said Justices of oyer and terminer shall sit."

Section 3 of this same statute declared—

"Whereas, the two shores of this State are divided by the waters of the Chesapeake Bay, and in some instances the counties of this State are divided by the waters of rivers or creeks, which may occasion doubts as to the trial of homicide in certain cases:

"*Be it enacted,* That from and after the end of this session of assembly, if a mortal stroke shall be given on the said waters of the Chesapeake, and the party so stricken shall die thereof within a twelve-month and a day, or if a mortal stroke shall be given in any part of this State, and the party so stricken shall die thereof on the said waters of the Chesapeake, in such case the party giv-

ing such mortal stroke, and all aiders and abettors, promoters, and accessories thereof and thereto, shall and may be indicted, arraigned, and tried in the General Court of either shore, or before Justices of oyer and terminer, sitting in any county of either shore, and judgment thereon be given, and execution had, in the same manner as if the stroke and death had both happened on either shore."

By section 4 a similar provision was made where the stroke occurred on the waters of any river or creek dividing any counties, and the death occurred on shore, or where the blow was stricken in any such county, and the death occurred on any such river or creek.

The careful omission of all mention of the County Courts from this act, shows that the law-makers considered they had already made ample provision for the trial by those tribunals of any crime, murder included, where the offense was *committed* in the county, irrespective of the place of death of the murdered person.

The jurisdiction of the County Courts in all criminal cases was confirmed by chapter 50 of November session, 1790, and by chapter 53 of November session, 1796, and remained unimpaired up to the passage of the act of Congress of 27th February, 1801, when the statute was passed creating the Court which was the predecessor of this tribunal.

In our opinion, then, it is clear beyond question that if a mortal blow had been stricken in either of the counties, part of which constitute the District as it now exists, and the party stricken had died in any other jurisdiction, the County Court of the county where the blow was stricken would have had undoubted jurisdiction to try and sentence the offender.

Much reliance has been placed by the counsel of the defendant upon two decisions alleged to have taken place within this jurisdiction, which, it is said, settles this question according to their contention.

The first case is the *United States* v. *Bladen*, reported in 1st Cranch, Circuit Court Reports, 548. The party there was indicted for manslaughter. It appeared that the fatal blow was struck in Alexandria, and the party died in Maryland, and it was decided by the Court that they were without jurisdiction to try him for the homicide, although he could be held for the assault.

It is worthy of remark in this case that Mr. Walter Jones, one of the most eminent lawyers of the country, on that occasion represented the United States. He insisted, as we have decided this day, that the recitals in the statute of Edward VIth were not correct statements of the common law at the time of its enactment. But the Circuit Court of the District of Columbia was holding its session in Alexandria, within a portion of the district ceded from Virginia, and its decision was controlled by the state of the law in Virginia. No such provision existed in the Virginia statute, at the time, as had been incorporated, as we have shown, into the law of the State of Maryland. It by no means follows that the Court would have decided the point in the same way if a case with similar facts had been presented at its next session on the Maryland side of the Potomac, in view of the explicit declarations of the Maryland statutes.

The other case referred to is that of the *United States* v. *James Rolla*. The brief of the defendant's counsel has copied literally the statement of the case taken from the American Law Journal, published in 1850. We have examined the original papers in the case, and are satisfied that there is nothing appearing in them that would justify the conclusion that the point now before us was considered or decided by the Court. It appears that on the 30th of June, 1848, the grand jury indicted a certain James Rawley for manslaughter. The indictment, which I hold in my hand, declares that on the 25th of April, in the county of Washington and District of Columbia, the said Rawley, in and upon a certain person to the jurors unknown, did make an assault and inflict upon him with a stick, which he then and there held, a mortal wound, of which the said person unknown, on the same day and year aforesaid, in the county aforesaid, died. The complete docket entries in the case are as follows:

"June 30th, 1848. No. 449. *United States* v. *James Rawley.* Manslaughter. Indictment. July 10th, *nolle prosequi*, and the prisoner remanded to wait the requisition of the Governor of Maryland or Virginia, and the district attorney to give immediate notice to the authorities of those States."

It seems hardly consistent with this entry that any offense could have been committed within the District, for in Bladen's case the Court had held that if the blow was struck in Alexan-

dria, within its jurisdiction, the party might be indicted for the assault. It would seem rather then, as a *nol. pros.* was entered, that it had been ascertained after the finding of the indictment that no part of the offense had occurred within the District of Columbia. On the 23d of October, 1848, the said Rawley, stating his name as Rolla, applied for a *habeas corpus*, and was brought before Judge Crawford on the same day by the marshal, with a statement of the cause of his detention, namely, that at some time in the month of April, 1848, in the county of Washington, he had struck a certain Saulsbury with a piece of wood and caused his death. The hearing was adjourned until the 30th of October, 1848, and on the 27th of November, 1848, the Judge passed the following order:

"The prisoner brought before me according to adjournment, and it being stated by the district attorney that the Attorney General of Maryland had communicated his opinion that Maryland had no jurisdiction in the case, and the authorities of Virginia not having, although twice at least informed of the facts, taken any measures to demand James Rawley for trial in Virginia, I feel compelled, after the lapse of time and the circumstances above named, to discharge him from custody, which is ordered."

And this is the entire record of the case. Manifestly there is nothing appearing in these papers to justify the inference that the point now made was either insisted upon or decided. The statement of the Judge would rather indicate that the grand jury had indicted a person who had been improperly accused, and who had, in fact, committed no such crime at all.

---

## THE STAR ROUTE CASES.

Judge Wylie's rulings in this *cause celebre* are vigorous, prompt and decisive, and cut first one way and then the other, as is likely to be the case with the impartial rulings of a competent Judge in a hotly contested case.